IN RE APPLICATION OF ROBERT J. BENNETT, ELIZABETH WEBB BEYER, MARI KAY BICKETT, JOHN S. BODGER, RICHARD BJUR, JUDITH H. BRAECK-LEIN, BONNIE BRAND, ROBERT H. BROILI, KARLA K. BUTKO, DENNIS CAMERON, CELESTE CARTER, KATERI CAVIN, DEANNA J. CONKLIN, WALDO DE CASTROVERDE, MARILYN CRAIG, CHARLES C. DIAZ, PAUL E. FERGUSON, WALTER B. FEY, BARBARA K. FINLEY, JOHN GAVIN, DON GISH, GREGORY F. GLODOWSKI, VALERIE GRUBIC, HERMAN G. HERBIG, GERALDINE K. HUGHES, DAVID HUMKE, GARY L. KENDRICK, BRADY W. KERESEY, JAMES KLABER, JEFFREY M. LAQUAGLIA, MICHAEL C. LEHNERS, PAUL E. LOOMIE, CUTHBERT E. A. MACK, ANN P. McCARTHY, WILLIAM J. McNULTY, MARY LOU McSWEENEY-WILSON, JOSEPH D. MERKIN, PHYLLIS MOEN, CHRISTOPHER MUMM, RANDAL MUNN, JERRY P. NIMS, KATHLEEN F. NONEMAN, WILLIAM B. NORK, JUDITH A. OTTO, JAMES P. PACE, RICHARD PRATO, BELINDA B. QUILICI, JAMES T. RICHARDSON, FLORENCE SCHROEDER, ROGER M. SHERMAN, MURIAL SKELLY, LYNN L. STEYAERT, ERIC A. STOVALL, DONNA M. SWEGER, RUTH J. TABOR, CATHERINE B. THAYER, LORNA L. WARD, KENT WOOD, KIMBERLY WOOD, AND FRANK YEAMANS, PETITIONERS, v. THE STATE BAR OF NEVADA, RESPONDENT.

No. 18400

December 3, 1987                           746 P.2d 143

*Bible, Hoy, Miller, Trachok & Wadhams,* Reno, for Petitioners.

*Samuel S. Lionel,* Chairman, Board of Bar Examiners; *Ann Bersi,* Executive Director; *John E. Howe,* Bar Counsel, for Respondent.

## OPINION

By the Court, GUNDERSON, C. J.:

The petition before us seeks a waiver of SCR 51(3) and requests this court to allow petitioners to be admitted as members of the State Bar of Nevada. Petitioners graduated from the Nevada School of Law (the school), formerly Old College School of Law, in 1985, 1986 and 1987, and all but one have successfully completed the Nevada bar examination since graduation. The Board of Governors of the State Bar of Nevada does not oppose the petition.

In 1984, the Nevada School of Law sought a waiver of SCR 51(3) which requires that an applicant for examination for a license to practice as an attorney in this state have received a law degree from an institution accredited by the American Bar Association (ABA). In January, 1985, this court denied the request for

a general waiver or modification of SCR 51(3). Nevertheless, we granted conditional relief to graduates of the school based upon our findings and conclusions. Specifically, based upon the record and our inspection of the school, we determined that despite its inauspicious beginnings and initial shortcomings, the school had made impressive strides toward academic credibility. Moreover, the school represented to the satisfaction of the court that it would have its physical plant, library, faculty, student admission practices, and student support services in condition to enable it, in good faith, to apply for ABA provisional accreditation by the fall of 1985. Accordingly, this court ordered that in the event the school achieved ABA provisional accreditation by August 31, 1988, such accreditation would be accepted as proof that any student graduating before accreditation has received an education "functionally equivalent" to that provided by an ABA-accredited school. Additionally, pending the granting of such accreditation, the court allowed the school's graduates to sit for the bar examination, conditioned upon the completion of certain corrective courses on or before the time of the school's accreditation. The successful examinees' admission to the State Bar of Nevada, however, was to be deferred until the ABA granted provisional accreditation to the school.

The school subsequently took various steps to overcome the deficiencies identified in our 1985 order. In September, 1986, the school applied to the ABA for provisional accreditation. An ABA inspection team examined the school during the week of November 15, 1986, and reported its findings to the Accreditation Committee for the Section of Legal Education and Admissions of the ABA (the Committee) on March 19, 1987. On April 28, 1987, the Committee denied the school's application for provisional accreditation.

In May, 1987, the school's trustees attempted to donate the school and its assets to the University of Nevada. Unable to convince the University to accept the gift or to overcome the school's substantial operating debt, the school's trustees voted to close the school after a ten-month "wind-down" period. Consequently, petitioners will be unable to satisfy the condition precedent to their admission to practice law in Nevada, *i.e.,* that the school achieve ABA provisional accreditation by August 31, 1988. Petitioners now contend that waiver of SCR 51(3) is appropriate, in spite of the ABA's denial of accreditation to the school, since the record as a whole demonstrates that the education received at the school was substantially similar or functionally equivalent to that provided at an ABA-accredited school. We agree.

The purpose of the educational requirement embodied in SCR 51(3) is to promote high standards of competence among members of the State Bar of Nevada. In re Nort, 96 Nev. 85, 605 P.2d 627 (1980). To evaluate an applicant's legal education effectively and expeditiously, without imposing an excessive burden on our resources, this court has elected to utilize the accreditation resources of the ABA. On the other hand, we must ensure that applicants are treated fairly and that any qualification for admission to the bar "must have a rational connection with the applicant's fitness or capacity to practice law." *Id.* at 89, 605 P.2d at 631. Accordingly, we have recognized exceptions and waived the application of SCR 51(3) "whenever it can be demonstrated that the rules operate in such a manner as to deny admission to a petitioner arbitrarily and for a reason unrelated to the essential purpose of the rule." *Id.* at 96, 605 P.2d at 635. *See, e.g.,* In re Burleigh, Supreme Court Docket No. 6874 (1972) (SCR 51(3) waived where applicant graduated from an institution not accredited by the ABA, and lack of accreditation was not related to the quality of legal education provided, but due to the geographical location of the school in Cambridge, England, outside the area encompassed by ABA accreditation activities); In re Herring, Supreme Court Docket No. 9738 (1977); In re Hope, Supreme Court Docket No. 10677 (1978); In re Bernard, Supreme Court Docket No. 10721 (1978) (SCR 51(3) waived in these three unreported cases where sole reason asserted for lack of accreditation was the proprietary status of the schools). Stated another way, if an applicant proves to this court that the education received at a law school not accredited by the ABA is nonetheless functionally equivalent to an education provided at an ABA-approved school, and the applicant has otherwise complied with all requirements of the law relative to admission to the State Bar of Nevada, the objective of SCR 51(3) has been met and a waiver of the rule may be appropriate.

In the present case, the Nevada School of Law took several steps since 1985 to improve the legal education offered and to overcome the deficiencies identified in our previous order. Specifically, the school provided supplemental courses to its graduates, extensively improved its facilities, increased its library collection from 34,000 hardbound volumes to 71,853 hardbound and microform volumes, hired a full-time library director holding J.D. and M.L.S. degrees, increased its full-time faculty to twelve, and established an employment placement office. The only deficiency identified in our order of 1985 which has not been remedied is the achievement of financial stability.

The report issued by the ABA's Accreditation Committee likewise recognizes several noteworthy achievements. Indeed, in

critical areas, the Committee's report can be read to support the proposition that the education received by petitioners was functionally equivalent to an education offered at an ABA-accredited school. We note that the Committee's report encompasses far more than just educational factors.[1] Indeed, in determining whether the school could operate in the future as a viable law school, the Committee directed its inquiry for the most part to financial and budgetary considerations. Ten of the fifteen findings and conclusions of the Committee focus primarily on the lack of financial stability and on factors related indirectly, at best, to the quality of the legal education offered.[2] Of the remaining five findings, No. 6 concerns the calibre of students admitted in the fall of 1986. This finding, however, is immaterial to this petition since these students are not presently before the court. Moreover, the remaining four findings, Nos. 4, 8, 9 and 10, do not conclusively demonstrate that the education received by petitioners was not functionally equivalent to that received at an ABA-accredited institution.

---

[1]The Committee's report set forth the following fifteen findings and conclusions: (1) The site evaluation team could not determine whether the educational policy and program of the Law School were under the direction of the Dean and faculty. (2) The financial stability of the school was in doubt. (3) The College and Law School administration "have been characterized by significant turnover in deans and College leadership." (4) The school's current budget and projected budgets for the next five years were unlikely to provide for adequate faculty salaries, experienced faculty, staff support, library funding, and student scholarships. (5) By 1990-91, the school projected that thirty percent of tuition income would go to overhead charges in the face of significant needs in the Law School. (6) The admissions standards did not assure admission only of students who have a reasonable chance of success, in light of plans to increase the size of the entering class. (7) The administrative staff was inadequate, i.e., the law school did not have a full-time admissions director, the registrar's office served the admissions function for both the Law School and the humanities school, and the Law School's placement program was operated by the Dean's secretary. (8) The overall academic rigor was perceived as low in light of admissions qualifications and the low rate of attrition, and in light of no firm attendance rule. (9) The graduates' performance on the 1985 and 1986 bar exams was mediocre and compared unfavorably to the nearest accredited law school in California, i.e., McGeorge School of Law, in Sacramento. (10) The faculty salaries were low, and there were no apparent plans to try to attract senior faculty. (11) The school had a history of inadequate library funding in its early years of operation, and long-range projections may have proven inadequate for anticipated growth. (12) The library had experienced rapid staff turnover. (13) The library had no significant retrospective collection of texts and treatises, has an inadequate card catalog for use in locating library sources, a weak general reference collection, and an inadequate access to microforms. (14) The physical facility was inadequate for future library growth. (15) The current physical facilities were rapidly becoming inadequate.

[2]These ten findings include Nos. 1, 2, 3, 5, 7, 11, 12, 13, 14 and 15. See, footnote 1, supra.

Finding No. 4 concerns the perceived inability of the school to attract full-time professors based on the current budget and the projected budgets for the next five years. This finding, however, looks mainly to the future. With respect to the *current* faculty, the inspection team's report notes: "The educational credentials of the current faculty are good in terms of academic background, representing a number of excellent law schools. The professional experience of some of the current faculty is broad." Similarly, although Finding No. 8 indicates that "overall academic rigor" had been low, the Committee concludes that "[c]lassroom teaching was judged by the site team to range from good to marginal." None of the teaching observed by the on-site inspection team was unacceptable. Although the teaching may not have been exceptional, it was in every respect adequate.

Finding No. 9 states that "[b]ar results have been mixed." The Committee notes that the "pass rate of Old College graduates on the Nevada bar exam has been about 69 percent . . . well below the 91 percent pass rate of the nearest California law school." This finding, more than any other, is subject to varied interpretations depending on the utilization and application of the variables. Broken down by year, the school represents that 67% passed in 1985, 77% in 1986, and 71% in 1987. Moreover, the school correctly suggests that it is misleading to compare the school's pass rate with the pass rate of the McGeorge School of Law only. We are not convinced that the pass rate of graduates of McGeorge School of Law, whose graduates historically have performed exceptionally well on both the California and Nevada bar examinations, is uniquely representative or standard of an acceptable pass rate. Indeed, we are persuaded that comparing Nevada School of Law to McGeorge, in support of denying accreditation to Nevada School of Law, was patently inappropriate. In this regard, we note that the Nevada School of Law's pass rate compared favorably with the pass rate for graduates from four ABA-approved California law schools commonly attended by Nevada students: University of San Diego (73%); California Western (63%); Loyola of Los Angeles (60%); and Whittier (28.5%). Indeed, the school's pass rate exceeded the pass rate for twenty-seven other ABA-accredited schools whose graduates sat for the same bar examinations. Thus, while the school's pass rate may not compare favorably with that of McGeorge School of Law, it nonetheless evidences that petitioners received an education sufficient to enable them successfully to pass the bar, and to practice law and advise clients as capably as graduates from many schools accredited by the ABA.

Finding No. 10 concludes that the school's conditions were inadequate to attract and retain a competent faculty. This finding, however, is based on the unproven assumption that funding would

have remained unavailable in the future. Further, it does not negate the inspection team's and the Committee's findings that "the current faculty are good in terms of academic background . . ." and that their teaching was good to marginal.

We note that the Committee's criticism of the school's law library, contained in Finding Nos. 11, 12, 13, and 14, is primarily directed at anticipated future needs. For example, Finding No. 11 concludes that "[l]ong-range projections [of funding] may prove inadequate for anticipated growth in the collection. . . ." Similarly, Finding No. 14 concludes, *inter alia*, that the "high ratio of occupied to unoccupied shelving, together with the anticipated rapid growth of the collection which will likely produce full capacity within one year . . . suggests a library that will soon be facing a physical plant crisis." The Committee's findings, however, do not indicate that the library was inadequate, in light of the size of the school and its particular needs, during the period of time petitioners attended the school.[3]

With respect to placement services, the inspection team noted that the placement program, operated by the dean's secretary, had achieved commendable results in placing many graduates. Specifically, we note that certain petitioners have been and are currently employed as law clerks with Nevada district court judges, a United States district court judge, the Attorney General of Nevada, the United States Attorney, the Washoe and Pershing County District Attorneys, the Washoe County Public Defender, and several private law firms. Without exception, these employers have indicated that the performances of these individuals were at least equal to the performances of graduates from ABA-accredited schools. In many instances, the employers found that their performances exceeded that of their ABA counterparts. In any case, again, whether or not a law school is well organized in placing its graduates would not seem to indicate with any strength the quality of education that a student receives while in residence.

Based upon the evidence in the record as a whole and our personal knowledge of the operation of the Nevada School of Law, we conclude that the education received by petitioners has been functionally equivalent to that received at schools accredited by the ABA. *See* Nordgren v. Hafter, 789 F.2d 334 (5th Cir.), *cert. denied,* _____ U.S. _____, 107 S.Ct. 177 (1986) (Mississippi legislature constitutionally allowed graduates of a non-ABA-

---

[3]In this regard, we note that the Nevada School of Law's library collection (71,800 volumes) exceeded the holdings of the Washoe County Law Library (approximately 33,708 volumes), the Nevada Supreme Court Law Library (approximately 70,000 volumes), the National Judicial College Library (approximately 63,000 volumes), and the Clark County Law Library (approximately 33,616 volumes).

accredited Mississippi law school to sit for the bar examination, while precluding graduates from out-of-state non-ABA-accredited schools, where the legislature and Mississippi Supreme Court were familiar with the unaccredited school in question).

Finally, although it does not oppose the granting of this petition, the Board of Governors of the State Bar of Nevada contends that any relief granted to petitioners must preserve the integrity of SCR 51(3). Specifically, the Board expresses concern that the granting of this petition may open the floodgates to unqualified graduates of inferior law schools, which are not accredited by the ABA, who might seek admission to the State Bar of Nevada, thereby adversely affecting the quality of the Bar. We are not persuaded that this order will produce or encourage such an effect. Petitioners correctly note that we addressed this issue in the case of In re Nort, 96 Nev. 85, 605 P.2d 627 (1980). In *Nort,* the petitioner sought a waiver of SCR 51(3) on the ground that he had attended Western State University College of Law, a non-ABA-accredited law school. Mr. Nort contended that since we had previously granted a waiver of SCR 51(3) to other Western State graduates, he was similarly entitled to a waiver. The former applicants had demonstrated that Western State had not been accredited by the ABA solely because it was operated for profit. We noted, however, that since the granting of the previous petitions, the ABA had allowed proprietary schools to seek provisional accreditation, and that Western State had declined to do so. Therefore, we were unable to determine whether Western State could have substantially complied with the other ABA requirements for accreditation, and we denied Mr. Nort's petition. *See* In re Nort, 96 Nev. at 94, 605 P.2d at 634 (quoting Application of Hansen, 275 N.W.2d 790, 795-796 (Minn. 1978), *appeal dismissed,* 441 U.S. 938 (1979)). Moreover, we concluded that we had not "created" a constitutional right to practice law without compliance with the state's admission requirements "merely because a wholly and expressly discretionary state privilege has been granted generously in the past." 96 Nev. at 95, 605 P.2d at 634 (*citing* Leis v. Flynt, 439 U.S. 438, 444 n.5 (1979)). Therefore, under the rule announced in *Nort,* a rule consistently adhered to by this court, any future applicants who have graduated from a non-ABA-accredited law school must similarly demonstrate, as have petitioners in the present case, that they have received an education which is functionally equivalent to an education received at an ABA-accredited school.[4] As we state in *Nort:*

---

[4]Significantly, we note that in the unreported case of In re Fihn, Supreme Court Docket No. 14809, this court waived SCR 51(3) in 1983 where the individual applicant made a detailed, prima facie showing that, at the time of

This court will continue to exercise its inherent and exclusive power to control admissions to the professional bar of this state, *see* Feldman v. State Board of Law Examiners, 438 F.2d 699 (8th Cir. 1971), so as to provide relief from the operation of the rules of admission whenever it can be demonstrated that the rules operate in such a manner as to deny admission to a petitioner arbitrarily and for a reason unrelated to the essential purpose of the rule. Absent such a showing, we will not entertain such petitions.

96 Nev. at 96, 605 P.2d at 635.

Based on the foregoing, we conclude that petitioners are entitled to relief. Accordingly, we hereby waive the requirements of SCR 51(3) as to the above-named petitioners who have successfully passed the bar examination and otherwise complied with the rules for admission of the Supreme Court of Nevada.

IT IS HEREBY ORDERED that petitioners will be admitted as members of the State Bar of Nevada with all privileges relating thereto, upon complying with any and all remaining requirements of law relative to such admission.[5]

STEFFEN, YOUNG, SPRINGER, and MOWBRAY, JJ., concur.

---

his graduation from law school, the ABA denied accreditation based on the propriety status of the school, a reason unrelated to the quality of education.

[5]It has come to our attention that at least one of the petitioners has not passed the Nevada bar examination. Moreover, some of the petitioners apparently have not taken or passed the Multistate Professional Responsibility Examination. With respect to these petitioners, we direct the Executive Director of the State Bar of Nevada to prepare a report detailing the names of such petitioners and, as to each, specifying any requirements which have not yet been met.